Please call the next case for argument. Case No. 25-1946 from Eastern Missouri, Express Scripts, etc. v. United States Mr. Byrne, may it please the Court, this is a factually intensive tax case. That's one thing the parties have agreed on here. The district court entered summary judgment holding that a deduction was not available for our clients, Express Scripts, under a 2004 statute that has since been repealed, and in particular under an implementing regulation that was adopted by the Treasury, which is referred to as the third-party comparable regulation. The issues, though, turn more on summary judgment procedure than on the tax code. And here we think that the error by the district court is that it did not allow inferences to be drawn in favor of Express Scripts, which was the party opposing summary judgment. The government doesn't even acknowledge that principle in its briefs because we think that if it does, if that principle, if that tenet of summary judgment practice is applied, the judgment can't stand. Now, what is all this about? It's about a claims adjudication software. Express Scripts is in the pharmacy benefit management business. And as part of that business, one of their key products is a software program that operates at the pharmacy level where the plan members of entities who sponsor prescription health benefit plans go to get their prescriptions filled. And when they go, the software performs what's called an adjudication of the corneum that they are submitting for prescription drug benefits at that point. And the adjudication is a process that takes into account, first, the identity of the member of the program and whether the person is entitled to the particular pharmaceutical involved, co-payments, co-insurance, third-party liability. Everything from A to Z is determined by the software. And so the issue becomes here whether or not that software is eligible for an online software deduction under that third-party comparable implementing regulation. In terms of the mechanics, who interacts with the software? Obviously, there's some contracts in here, but I'm just wondering who actually types things into the software? Physically, the send button is pressed by usually the pharmacist, sometimes by the member of the benefit plan, him or herself, sometimes by a relative. Express Scripts really has no way of knowing that generally. So the descending of the claim is at the pharmacy level almost always. Does the plan sponsor really use, like a J.C. Penney's, or do they really use the software or type anything into the software? They input into the software their members, who's entitled to be in their plans. They input that and the characteristics that are relevant to their claim of membership. For example, what are they entitled to and how much? What's their deductible if they have one? How much of a benefit do they have left? Do they have a copay? That sort of thing goes into the software, and the software does it all from A to Z after that. Let me ask you two questions, and they're kind of alternatives, which is, is that type of interaction of just putting in the names of the people and the benefits, is that enough to get the deduction, or does it just not even matter whether they interact with the software in your view? And the fact of the matter is the fact that they use it even indirectly is good enough. Your Honor, we think the indirect access is good enough, that it is sufficient given the nature of this software, which for it to be effective has to work almost instantly, and it does. And so at the time that it was developed and millions of dollars went into this, it was a cutting-edge piece of software that applied a rules-based set of programs to get the job done. So the job is important because the job is what the plan sponsors are required to do under ERISA. That is, adjudicate their members' claims under a fiduciary duty standard. But that makes it unlike the tax software, right? So if you're saying the interaction doesn't matter, then I think that's different than the tax software, where either the end consumer or the accountant or the representative interacts with the software, but the accountant is acting as the agent of whoever, you know, whoever told them to do their taxes, right? And so that's not really like this case in the same way. So I don't understand that part of the argument. Well, let me try to clarify that, Your Honor. It's a very good question. We don't believe that interaction is required by the regulation, that the kind of typing and that kind of interaction that you would have with Example 5 under the regulation, we call it the TurboTax example, although they're not named, but that's pretty much what Example 5 is about, and we rely on that example. But there is no requirement there that there be that kind of extended interaction with a lot of typing and inputting in order for the software to qualify. It's just better software is really the bottom line.  Now, the government has argued... Counsel, did you say that you used the phrase, the person that hits the send button, is that the pharmacist? Usually, Your Honor. But the customers, Express Script's customers are plan sponsors, correct? Also correct, Your Honor. That's right. So that would be, could be a labor union, could be any entity that manages one of these plans, correct? That's right, Your Honor. And it's our contention that there's at least a fact issue about this point. If the government says, well, if the plan sponsors didn't have an employee pressing the send button, then that's not either access to the system or direct use of it. But we say that there's at least a reasonable inference that when the employees or the people who have the drug benefit are channeled and instructed to go and do just that, that who presses the send button doesn't matter. Or we say at least there's a fact question about that that should have been resolved through a trial, if the reasonable inferences are to be drawn in favor of the party opposing summary judgment. Now, the government has also argued that access to the source code of the program is necessary and the district court so found. But, again, the regulation says nothing about that. And it's not surprising that in a highly proprietary world of software, access to the source code would not be required or permitted. And TurboTax certainly doesn't allow, doesn't need to have anybody have access to its source code in order to present, in order to provide its product. So we say that's not an issue. Now, it is true that there are extensive references in the pharmacy benefit management agreements between the plan sponsors and our clients concerning claims adjudication services. There are plenty of references to services. And these contracts were adopted over a period of years. So they vary quite a bit. One of them is actually with a different company. But they do refer to claims adjudication services frequently. And we say that that service was provided by Express Scripts by providing the software. And who provided it was at least a question that should have been resolved through a trial. Now, the government also cites a couple of cases I'd like to address. One, a Seventh Circuit decision in direct supply. And the second is a tax court decision that was briefly affirmed by the Tenth Circuit. Counsel, before you move on, I just want to ask this question. So I'm looking back at the Treasury regulation. And it says providing customers access to computer software for the customer's direct use. And I just wonder if that counters your argument that the plan sponsor doesn't have to access it. Direct use means direct. Like if it's just use, maybe you get away with it. But direct use seems to be implying something else entirely. We think, Your Honor, that it's at least enough to get our client to trial on the direct use issue in that our client doesn't use the software. Our client has a strict line of demarcation about not using the software it provides. And one reason the business is structured this way is that Express Scripts doesn't want to take on ERISA liability for all of those millions of decisions. It's utterly radioactive, frankly, in the liability world. So there's enough here, we believe, Your Honor, to say that the direct use question required a trial with cross-examination, consideration of expert witnesses, assessments of credibility, and so forth on that issue. Now, if I may, the direct supply case from the Seventh Circuit is cited by the government, but distinguishable, we believe, on several grounds. First, what direct supply did was their software facilitated the purchase of goods from the taxpayer. So unlike the claims adjudication software here, which performed only one function, here in those cases in direct supply and in another case I'll talk about, the software facilitated the purchase of goods and other unrelated services from the taxpayer. And Judge Easterbrook in direct supply noted that if the taxpayer had at least put on evidence to segregate the qualifying receipts from the non-qualifying receipts, it would have been a more complicated case, he said. He didn't say it would necessarily reverse it, but he said it would be more complicated. But he said that the one impossible result was the one where all of the receipts qualified, where there were clearly qualifying and non-qualifying activities at issue. So a similar case, the Tenth Circuit's affirmance of the BATS case, again, another marketplace case where there's a securities exchange, the software that's involved facilitated another service, and the tax court said that's not good enough to claim the deduction under the regulation. The Tenth Circuit affirmed, but the Tenth Circuit did not reach the direct use question. The court dropped a footnote saying, we're not deciding that. We decided it on the grounds that there was really no third-party comparable evidence presented. And here, of course, we have presented evidence, and the government actually didn't argue for summary judgment on this basis, that there are third-party comparable vendors in the field. So, Your Honor, we ask that the court set aside the judgment of the district court and remand the case for trial where the court can consider witnesses, hear their testimony, and draw all inferences that are reasonable in favor of express scripts. I'll reserve the rest of my time. Thank you. Mr. Carpenter. May it please the court. Good morning, Your Honors. The express scripts was not entitled to the Section 199 deduction because the undisputed facts show that express scripts provided services, not software access within the meaning of the regulation. They provided, they described it in various ways in their contracts and so forth, but claims processing or claims adjudication services. There's a serious question whether the statute's plain meaning supports the regulation. The absolute bar against service is more or less absolute. I don't think the statute reads that way. That the statute doesn't bar services? I think the Treasury regulation, like some others I've dealt with in the last 20 years, overreaches. I see. I see. There could be an argument made to that effect. I know the validity of the regulation hasn't been challenged here, and certainly Treasury recognized that services are out. Services are out and recognized that even the service of providing access to software for customers' direct use, that is a service. But, of course, if a literal reading of the regulation, whose validity it has not been challenged, but if a literal reading would be questionable, a questionable interpretation of the statute, shouldn't that tell us how literal to read it? I think that's fair. I think Treasury intended that it be read very, they said in the preamble, narrowly tailored. They essentially said, this is as close as we can come because the statute's really clear. And reasonable minds maybe could disagree on whether they could even get that close. But that's not an issue here. Should we be cognizant of that? I mean, I think that this is really kind of a lope or bright issue. Like in terms of writing the opinion, suppose we agree with the government, right? We would essentially be interpreting a regulation that maybe we have doubts whether it is valid in light of the statute. So should, you know, a different way of asking, I think, Judge Loken's question is, what should we do about that, if anything? Or do you just, you know, drop a footnote saying the validity of the regulation is not before us? I think that would be the right answer. And, you know, courts have done that in other cases. As Judge Loken said, sometimes these things come up and you have a regulation that's sort of a taxpayer favorable regulation and the taxpayer wants the regulation to be valid, so nobody's challenging it. And, yeah, courts will sort of drop a footnote, and if someone were to challenge it, then that would come up. I mean, I do think the regulation can be defended in terms of the statute, because what the regulation is really doing is it's saying, well, Section 199 requires a disposition, like a sale or a license, and so in this one very narrow circumstance, we're going to allow the deduction where providing online software access is functionally equivalent to a disposition. And Congress recognized that those would be, or sorry, Treasury recognized those would be narrow circumstances. They said in the preamble they knew that it might have only, quote, limited applicability, unquote. And, you know, there were calls and comments to provide a broader exception. Treasury said, no, this is as far as we can take it. They said, quote, in order to give meaning to the statutory language requiring a license sale or other disposition, that was the reason that they. . . All this led me to look more closely, particularly at direct supply, because Judge Easterbrook is usually pretty shrewd on all issues, but certainly tax issues. And, of course, the basis of this ultimate affirmance is that the taxpayer overreached. It tried to get 100. . . It went for all or nothing. Sure. Sure. And he said the right answer was not all, probably wasn't nothing, but you didn't prove the in-between. That, I think, there's quite a parallel here. In terms of ESI's position in the tax administrative appeal, they went for all or nothing. And now they say, oh, we at least have a tribal issue. Is that a fair, in your view, is that a fair, not equation, but a way to read ESI? I mean, I think the record shows that they did. . . They have made some effort to kind of allocate receipts in ways that direct supply didn't. Yeah, but. . . Well, yes, and then there's the question about the prior. . . that if you got a good case, pay and sue for refund because you'll get killed in the tax court. And the irony here is that the tax court is much more sympathetic to this shouldn't be all or nothing, at least, than the district court. So we have a reversal of roles that's almost ironic. Sure. Sure. I think so. And it reflects in ESI's litigation strategy. Yes. Yes. I think, you know, talking about Judge Easterbrook, you know, he has that language at the end. Like, you know, it might be a more complicated case. That's the paragraph that I think is critical. Yes. I mean, I think in our view, it wouldn't be a more complicated case because there's still the fundamental problem. Essentially, you have to have three things. Setting aside the comparable part, you have to show that you provided your customers with direct access to online software for the customer to use. That's reg language. Right. That's the overreaching language, arguably. Sure. But the other part is then you have to show not only that you provided that access, but that your customers were paying for that access. So I think we would say in direct support. Well, they're paying for a package. Yes. Yes. I mean, here they are. The package includes not only, well, you can call them services, but the packages include a software component. Well, the packages. They're not necessarily buying, but they're getting the benefit of. Yes. The packages contain a component. They contain a service that is provided through software or that's facilitated by software. And in that regard, that's why we would say in direct supply it wouldn't be a closer question. And we're dealing with a 12-year statute, which is long gone. So that makes it even more mysterious. It is, yes. At some point, these claims will end. It doesn't matter because of time and this expiration of the statute. As a matter of plain meaning, why isn't all this, and we're back to the statute, I know, but a license? Because what you're saying is essentially you, J.C. Penneys, as part of this package are getting a license to use the software. Like, you're not using it directly, but on the other hand, Sears doesn't get that. I think Sears is out. Kmart, whatever. Doesn't get a chance to have that. A competitor doesn't have a chance to have that. That sounds an awful lot like a license under plain meaning. I mean, I guess we're in the reg, but, you know, I want to ask you, what about the statute on that? I mean, I think there could be cases where there would be a license. And if you have a license, then you're within the statute. You don't need the regulation. Express Scripts argued that their agreements constituted or gave licenses. In the district court, the district court rejected it. They haven't renewed it on appeal. So then I think the license issue isn't before you. But, you know, and I think it's not before you because when you look at the agreements, there's no language about license. You know, whatever it says about software all goes the other way. You know, many of the agreements specifically say nobody, you know, or specifically say that only Express Scripts can access the software. None of them say there's a license of software. I would assume that customers, the plan sponsors were aware that Express Scripts would use the software to provide this claims processing service. Some of the contracts refer to it as electronic claims processing. But that's what essentially the plan sponsors are outsourcing that function to Express Scripts. And that's fine. It's probably very valuable, probably great software. There's not an issue about that. It's just that that is not the same as the kind of license you would get if you, you know, if you bought TurboTax, for example, and to, you know, to download it. The kind of access that the regulation is talking about is the same. You need to have the same kind of access that you would have if you bought the software. Suppose it's like a partial access. And, you know, sometimes you get appeals not in the pharmaceutical context but in the insurance context. And so suppose it's said when there's a problem, the plan sponsor can go in and override. So they can go into the system and say, actually, I know you've adjudicated this, but we just received a phone call from Insured. And, you know, we think they're right. We think that you should cover this very expensive drug. And they can go in and say, we're overriding this. And then what shows up at the pharmacy is $0 copay or something like that. Would that be a different case in your view? It would be a different case. Whether it would be a different result, maybe. It would be a much closer case. That's closer to BATS and direct supply where at least the customers could do something with the software. You know, they could interact with the software. And presumably, you know, there could be some level of interaction that you're to the point where you're accessing it for direct use within the meaning of the regulation. In this case, you know, my friend said that sponsors were inputting information into the software. And there's nothing in the record. They haven't cited anything in the record that shows that. Plan sponsors did provide information to Express Scripts that I don't know if they provided it in a database form or if Express Scripts put it in a database form. But information was provided to Express Scripts. That information ended up in databases that the software referenced in doing what it did. Express Scripts on their own – sorry, customers on their own computers could not pull up Express Scripts software, couldn't see it, couldn't interact with it. Suppose that they're right about that. I understand there's nothing in the record, but that's kind of a variation of the question I was just asked, which is on the front end. They go in and they input, you know, it says like, what is the deductible for this type of drug or copay? And they enter copay. And then they list John Smith and Jack Jones and, you know, the hundreds of thousands of people they have. They go in there and they actually interact with the software. But they never touch it again. Is that enough for direct use? I would say not. Again, it's closer. It's more like direct supply, more like BATS, where, you know, in direct supply, the customers, they could enter information into the software. And in BATS, you know, you could enter trade orders into the software. The customers could. But that wasn't the same thing as having access to the software itself for direct use, because the software was capable of doing much more. And only BATS or only direct supply could actually do all of those things, could access the full functionality of the software. And that's the same thing here. Even if you could attribute, like, pharmacists' interactions indirectly with the software to the customers of Express Scripts, it's still the case that only Express Scripts could make use of the full functionality of the software. But that's pretty slippery. I know, again, that's not the case. But I'm trying to figure out what the rule is. Because in TurboTax or tax cut, we just, you know, alter our taxes. We're supposed to get them done. You know, you buy a certain version of the software. You might buy the basic version. Well, it doesn't do the capital gains for, like, property dispositions that you might have. And so you're not getting full access to the software that you, you know, may want. And so that becomes very tricky, even under the example in the reg. Sure. No, I see that. I think the answer there would be, you know, when you're talking about, well, what's the comparable, if you buy the basic version of the online version of TurboTax, you're getting all the functionality that you would get if you went to the store and bought a disk of the basic version. And so you would still be getting comparable access. It's really, the regulation is focused on where it's, everything is like a disposition of software except for the delivery mechanism. You're not buying a disk or a download. You're accessing it through the Internet. The software remains on the owner of the software's computers. You're accessing it. It's just in a different manner. I do want to mention one other thing. Your honors don't necessarily need to reach it, but we have made the alternative argument about the lack of a qualifying third-party comparable. I just wanted to note that we did raise that in our summary judgment briefing. It is document 85-2 in the record at pages 33 through 34. So we did raise that. You could consider it even if we didn't, but we did. And I see that I'm out of time. We would ask the court to affirm the judgment of the district court. Thank you. Thank you. Thank you. For rebuttal. Yes, Your Honor. Thank you. My friend made the point that he was unaware of where in the record there was testimony about the inputting of databases from the plant sponsors into the system. That's found in Mr. Neville's declaration, paragraph 8, which is in the addendum, where Mr. Neville, who is an executive of Express Scripts. Say again, who? Mr. Neville, N-E-V-I-L-L-E, Frank Neville, Your Honor. And his declaration is actually in the addendum, not in the appendix, so we thought it set out the facts in a concise way in a case where concise is especially needed. The point was made that, well, this is an online service. Let's say that's right. The regulation sets out an exception to the general rule that online services are not eligible for deduction. It was referred to as the third-party comparable exception. Now, the government has never taken the position that its regulation is invalid. So the parties didn't brief that. It's not jurisdictional, as far as we know, and so that hasn't been asserted by the government. And we think that the exception applies here, at least to the extent that Express Scripts has earned a trial on the disputed issues of fact. Now, the question of how much interaction there has to be with the software can't be something that's decided as a matter of law here. If the plan members were required to stand in a pharmacy and type for 15 minutes, the pharmacies would close. I mean, that dog won't hunt in this business. So this software operates differently where there is not a need for extensive inputting by the plan members at the point of sale. So if that question turns out to be decisive, if the level of interaction is decisive here, then that's got to be a fact question that should be decided with a full trial. So we ask that the court vacate the judgment and order a trial. Thank you, counsel. The case has been well briefed and argued. A case out of the past. It doesn't make it easier at all, but we will do our best.